PACIFIC LEGAL FOUNDATION
JOSHUA POLK (Cal. Bar No.329205)
JPolk@pacificlegal.org
ANDREW R. QUINIO (Cal. Bar No. 288101)
AQuinio@pacificlegal.org
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111

CHRISTIAN TOWNSEND (TX Bar No. 24127538) *
CTownsend@pacificlegal.org
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881

* *Pro Hac Vice*
*Attorneys for Plaintiff*
*Quadrant Performance Materials, LLC*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| QUADRANT PERFORMANCE MATERIALS, LLC, a Texas limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>KATHERINE M. BUTLER, Director of the California Department of Toxic Substances Control,<br><br>Defendant. | Case No. 2:26-cv-10704-SVW-PD<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: December 7, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Stephen V. Wilson<br>Courtroom: 10A, 10th Floor<br><br>Action Filed: September 21, 2026 |

## TABLE OF CONTENTS


INTRODUCTION ........................................ 1

STATEMENT OF FACTS ........................................ 2

Quadrant Manufactures Spray Foam in Texas and Sells Spray Foam in California ........................................ 2

California's DTSC Regulates Quadrant as a Manufacturer of Spray Foam ............ 3

STANDARD OF REVIEW ........................................ 8

ARGUMENT ........................................ 9

I. Quadrant Is Likely to Prevail on the Merits of Its First Amendment Claim ........................................ 9

A. The Payment Requirement Compels Quadrant to Subsidize Private Speech ........................................ 10

B. The Funded Speech Is Not Government Speech ........................................ 11

C. The Payment Requirement Is Not a Necessary Incident of a Comprehensive Regulatory Scheme ........................................ 14

D. The Payment Requirement Fails Exacting Scrutiny ........................................ 15

II. Independently, the Payment Requirement Violates the Dormant Commerce Clause ........................................ 17

III. Quadrant Will Suffer Irreparable Harm Absent an Injunction ........................................ 18

IV. The Balance of Equities and the Public Interest Strongly Favor Injunctive Relief ........................................ 20

V. The Court Should Waive the Bond Requirement or Require Only a Nominal Bond ........................................ 21

CONCLUSION ........ 21

CERTIFICATE OF COMPLIANCE ........ 23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ........ 16

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ........ 8

*Am. Chemistry Council v. Dep't of Toxic Substances Control*, No. F082604, 2022 Cal. App. Unpub. LEXIS 7033 (Cal. Ct. App. Nov. 18, 2022) ........ 3

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ........ 15

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023) ........ 19

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) ........ 20

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847 (9th Cir. 2009), *vacated on other grounds. Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606 (2012) ........ 19

*Chicago Tchrs. Union, Loc. No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292 (1986) ........ 18

*Delano Farms v. California Table Grape Comm'n.*, 318 F.3d 895 (9th Cir. 2003) ........ 14

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) ........ 18

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ........ 18

*Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*, 466 U.S. 435 (1984) .......... 18

*Elrod v. Burns*, 427 U.S. 347 (1976) .......... 18

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) .......... 20

*Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457 (1997) .......... 11, 13–14

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878 (2018) .......... 9, 15–16

*Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550 (2005) .......... 10–11

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) .......... 20

*Kassel v. Consol. Freightways Corp.*, 450 U.S. 662 (1981) (plurality opinion) .......... 17

*Knox v. SEIU, Local 1000*, 567 U.S. 298 (2012) .......... 9–10, 15

*Matal v. Tam*, 582 U.S. 218 (2017) .......... 13

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) .......... 18

*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023) .......... 16

*Nken v. Holder*, 556 U.S. 418 (2009) .......... 19

*Paramount Land Co. LP v. Cal. Pistachio Comm'n*, 491 F.3d 1003 (9th Cir. 2007) .......... 11

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) .......... 16–17

*R.J. Reynolds Tobacco Co. v. Shewry*,
423 F.3d 906 (9th Cir. 2005) .......... 14

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. Vilsack*,
6 F.4th 983 (9th Cir. 2021) .......... 11–12

*Riley's Am. Heritage Farms v. Elsasser*,
32 F.4th 707 (9th Cir. 2022) .......... 19

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) .......... 16

*Short v. Brown*,
893 F.3d 671 (9th Cir. 2018) .......... 8

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) .......... 13

*Sierra Forest Legacy v. Rey*,
577 F.3d 1015 (9th Cir. 2009) .......... 20

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001) .......... 9–10

*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005) .......... 18

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 8

*Zepeda v. INS*,
753 F.2d 719 (9th Cir. 1983) .......... 19

**Constitutional Provisions**

U.S. Const. amend. I .......... *passim*

U.S. Const. amend. XI .......... 19

U.S. Const. art. I, § 8, cl. 3 .......... 2, 17

**Statutes**

Cal. Code Regs. tit. 22, § 69501 *et seq.* ....................4–5, 15

Cal. Code Regs. tit. 22, § 69511 ....................5

Cal. Health & Saf. Code § 25251 *et seq.* ....................3–4

Cal. Stat. ch. 560, § 1 ....................3

**Regulations**

Cal. Dep't of Toxic Substances Control*, Final Statement of Reasons: Safer Consumer Products Regulations-Listing Spray Polyurethane Foam Systems with Unreacted Methylene Diphenyl Isocyanates as a Priority Product*, R-2014-04 (Feb. 2018) https://tinyurl.com/265uuu4c. ....................5

**Rules of Court**

Fed. R. of Civ. P. 65 ....................2, 20

L.R. 7-3 ....................3

L.R. 11-6.1 ....................22

**Other Authorities**

Am. Chemistry Council, *Why Spray Polyurethane Foam? California State Fact Sheet* (Mar. 16, 2015), https://tinyurl.com/4k7dmtxx ....................2–3

*Diversity, Equity, Inclusion & Justice Statement*, Rose Found. https://rosefdn.org/about/deij-statement/ ....................7

Foam and Coating Manufacturer, Spray Polyurethane Foam Alliance, https://tinyurl.com/42ezju5v ....................3

*Our Mission, Vision, and Roots*, Rose Found., https://rosefdn.org/about/ ....................7

U.S. Consumer Product Safety Comm'n, *Spray Polyurethane Foam Insulation: Health and Safety Recommendations for Consumers*, https://tinyurl.com/ya9n7nxm ....................2

## INTRODUCTION

Spray polyurethane foam systems (spray foam) with unreacted methylene diphenyl diisocyanates (MDI) comprise multiple different products used for diverse and essential functions, including thermal insulation in homes and businesses, and energy-efficient and durable roofing systems. Spray foam promotes energy savings, helps reduce greenhouse gas emissions, and makes buildings more resilient and safe.

Nevertheless, California's Department of Toxic Substances Control ("DTSC") has issued a series of regulations targeted at removing or counteracting potential negative health effects from MDI. Despite having never found a single person harmed by spray foam, DTSC has required spray foam companies to comply with several safety regulations—none of which Plaintiff challenges. But DTSC has gone further. In recent Final Determinations, DTSC is now requiring spray foam companies—including Plaintiff, Quadrant Performance Materials, LLC (Quadrant)—to pay two cents per pound of spray foam they sell in California, for at least five years and until total payments reach $4 million, to a private, third-party administrator that runs a Green Chemistry and Engineering Innovation Fund (Green Research Fund). This nonprofit will then use the Green Research Fund to provide payments to other third-party groups to conduct and publish research with the goal of eliminating MDI from spray foam. But Quadrant has already done its own research to demonstrate there is no feasible alternative to MDI in its product.

The Final Determination has a series of constitutional defects—including violating the First Amendment and Dormant Commerce Clause. It is a settled principle: the government may not compel one private party to subsidize the speech of others. The payment requirement also burdens interstate commerce in exchange for local benefits that are, by DTSC's own account, speculative. Quadrant seeks a preliminary injunction to stop the payments before they violate Quadrant's constitutional rights. Because the payment requirement violates the Constitution, and because money paid into the Fund will be distributed to third parties and likely

cannot be recovered, an injunction is warranted. It serves the public interest, preserves the status quo, and allows Quadrant to vindicate its constitutional rights before they are lost.

## STATEMENT OF FACTS

### Quadrant Manufactures Spray Foam in Texas and Sells Spray Foam in California

Plaintiff, Quadrant Performance Materials, LLC (Quadrant), was founded in 2022 and has grown to be one of the largest spray foam manufacturers in the United States. Jamieson Decl. ¶ 5. Quadrant manufactures spray foam at its facility in McKinney, Texas, selling its product to contractors and distributors across the country, including in California. *Id.* at 2, 5. Spray foam is sold as a system composed of two liquid chemical mixtures that are sold or distributed together and are referred to as "sides." U.S. Consumer Product Safety Comm'n, *Spray Polyurethane Foam Insulation: Health and Safety Recommendations for Consumers*, https://tinyurl.com/ya9n7nxm. "Side A" of the system consists of methylene diphenyl diisocyanates (MDI), and "Side B" consists of a mixture of polyols and other ingredients, which may include catalysts, blowing agents, flame retardants, and surfactants. *Id.* The chemical mixtures in the sides react when mixed to form polyurethane foam that is used for insulation, roofing, or sealing and filling voids and gaps. *Id.*

Spray foam has been used for years in California in a wide variety of applications. One of the primary uses of spray foam is thermal insulation in homes and businesses, and energy-efficient and durable roofing systems. Spray foam promotes energy savings, helps reduce greenhouse gas emissions, and makes buildings more resilient and safe. Am. Chemistry Council, *Why Spray Polyurethane Foam? California State Fact Sheet* (Mar. 16, 2015), https://tinyurl.com/4k7dmtxx. Spray foam also reduces energy consumption, with annual energy savings estimated at $900 for each California household. *Id.* Those energy savings translate to

avoidance of 800,000 tons of greenhouse gas equivalents from the environment for the lifespan of these homes. *Id*. Spray foam has been used in California for years with no demonstrable adverse health impacts. Quadrant believes that it sells the premier spray foam on the market and has worked to ensure that its spray foam is as safe and optimized as possible. Jamieson Decl. ¶ 6.

As California itself acknowledges, manufacturers of spray foam are "mostly out of state." *Am. Chemistry Council v. Dep't of Toxic Substances Control*, No. F082604, 2022 Cal. App. Unpub. LEXIS 7033, at *31 (Cal. Ct. App. Nov. 18, 2022). The spray foam industry is heavily centered in Texas. There are more spray foam producers in Texas than in any other state. Foam and Coating Manufacturer, Spray Polyurethane Foam Alliance, https://tinyurl.com/42ezju5v. Only one spray foam manufacturer remains in California, and even it maintains manufacturing sites outside the State. Jamieson Decl. ¶ 4.

**California's DTSC Regulates Quadrant as a Manufacturer of Spray Foam**

In 2008, the California Legislature adopted a "Green Chemistry" law in its Health and Safety Code. (*See* 2008 Cal. Stat. ch. 560, § 1, codified at Cal. Health & Saf. Code § 25251 *et seq*. (the Green Chemistry law)). The Green Chemistry law requires DTSC to adopt regulations establishing a process (1) "to identify and prioritize those chemicals or chemical ingredients in consumer products that may be considered as being a chemical of concern, in accordance with the review process specified [in this law]," (*id*. § 25252(a)), and (2) "for evaluating chemicals of concern in consumer products, and their potential alternatives, to determine how best to limit exposure or to reduce the level of hazard posed by a chemical of concern, in accordance with the review process specified [in this law]," (*id*. § 25253(a)(1)).

The Green Chemistry law identifies potential regulatory responses following the listing of a product as a Priority Product. These regulatory responses include: (1) no action; (2) requiring additional information needed to assess a chemical of concern and its potential alternatives; (3) requiring labeling or other type of

consumer product information; (4) imposing a restriction on the use of the chemical of concern in the consumer product; (5) prohibiting the use of the chemical of concern in the consumer product; (6) imposing requirements that control access to or limit exposure to the chemical of concern in the consumer product; (7) imposing requirements for the manufacturer to manage the product at the end of its useful life, including recycling or responsible disposal of the consumer product; (8) imposing a requirement to fund green chemistry challenge grants where no feasible safer alternative exists; or (9) any other outcome the department determines accomplishes the requirements of this article. (*Id.* at § 25253, subd. (b).)

In 2013, DTSC adopted "Safer Consumer Products" regulations. (*See* Cal. Code Regs. tit. 22, § 69501 *et seq.* (SCP Regulations); *see also Final Statement of Reasons, Safer Consumer Products* (R-2011-02). The SCP Regulations describe "the process for identifying and prioritizing Priority Products and their Chemicals of Concern, and identifying and analyzing alternatives to determine how best to eliminate or reduce potential exposures to, or the level of potential adverse impacts posed by, the Chemical(s) of Concern in Priority Products." (Cal. Code Regs. tit. 22, § 69501, subd. (a).) They establish the standards for (1) identifying Candidate Chemicals (*id.* at §§ 69502–69502.3), (2) identifying and prioritizing product/chemical combinations (*id.* at §§ 69503–503.7), and (3) conducting an "Alternatives Analysis" (*id.* at §§ 69505–505.9). Specifically, an "Alternatives Analysis" requires a manufacturer to conduct "an evaluation and comparison of a Priority Product and one or more alternatives to the product." (*Id.* at § 69501.1(a)(10).) Thereafter, DTSC selects "one or more regulatory responses for Priority Products and/or selected alternative products." (*Id.* at § 69506(a).) Potential responses following an Alternatives Analysis include a requirement to provide product information to consumers, (*id.* at § 69506.3), restrictions on the use of chemicals in a Priority Product, (*id.* at § 69506.4), or a product sales prohibition, (*id.* at § 69506.5).)

Effective July 1, 2018, DTSC adopted a regulation listing as a Priority Product "Spray polyurethane foam systems containing unreacted methylene diphenyl diisocyanates (MDI)." (Cal. Code Regs. tit. 22, § 69511.) In its *Final Statement of Reasons* published in conjunction with its listing of spray foam as a priority product, DTSC determined that it was listing spray foam as a Priority Product because the presence of unreacted MDI "results in the potential for adverse work-related health effects, such as work-related asthma." Cal. Dep't of Toxic Substances Control, *Final Statement of Reasons: Safer Consumer Products Regulations—Listing Spray Polyurethane Foam Systems with Unreacted Methylene Diphenyl Isocyanates as a Priority Product*, R-2014-04 at *13 (Feb. 2018) https://tinyurl.com/265uuu4c. It cited eight cases of work-related asthma specifically attributed to exposure to unreacted MDI between 1993 to 2008. *Id*. But it acknowledged that none of these cases were "directly attributed" to exposure to spray foam. *Id*. To date, DTSC has never identified a single person who has been harmed by spray foam products in California.

Listing spray foam as a Priority Product triggered requirements for manufacturers of spray foam systems to determine if they could make those products safer. The SCP Regulations require manufacturers to either eliminate or replace MDI in their product or complete an Alternatives Analysis (AA) to continue selling their product in California. Cal. Code Regs. tit. 22, § 69505.1. An Abridged AA Report is submitted when manufacturers have not identified a feasible alternative. On October 16, 2025, Quadrant submitted an Abridged AA Report. Quadrant evaluated several types of alternatives, including those without MDI and alternatives that may reduce exposure to MDI. Quadrant Performance Materials, LLC, *Abridged* Ex. A. Quadrant did not find these alternatives to be functionally acceptable or technically or economically feasible. *Id*. DTSC issued a Notice of Compliance for Quadrant's Abridged AA Report on April 28, 2026. Jamieson Decl. at Ex. B.

On August 21, 2026, DTSC issued a Notice of Final Determination (Final Determination) to Quadrant, imposing three requirements on the company in order for them to continue shipping spray foam into California. Dkt. 1-1 at 5. The first two requirements seek to protect workers' safety by directing Quadrant to provide hazard and protective equipment information on its product labels and websites, and requiring Quadrant, through its sales agreements, to ensure that applicators complete health and safety training. *Id.* at 4–16. Quadrant does not challenge either of these requirements.

However, DTSC went further, requiring Quadrant to pay $0.02 per pound of spray foam sold in California into a Green Chemistry and Engineering Innovation Fund (Green Research Fund). *Id.* at 17. The payments continue for five years on sales beginning July 1, 2026, or until the Green Research Fund reaches $4 million, "whichever comes second." *Id.* at 17; *see id.* at 27. The payment obligation thus reaches back to sales made nearly two months before DTSC issued the Final Determination. While all spray foam manufacturers that have completed the AA process will be required to pay into this fund, should those producers cease selling in California, Quadrant would be responsible for the entire $4 million dollar funding requirement. This means Quadrant's obligation has no fixed end date: if other manufacturers abandon California, Quadrant must keep paying until the Fund reaches $4 million. *Id.* at 17, 27.

And the payments do not go to the California government or to DTSC. All payments made by Quadrant and other spray foam manufacturers go directly to a third-party administrator selected by DTSC, to be held in an account that funds the Green Research Fund. *Id.* at 18. DTSC informed Quadrant that it chose the Rose Foundation to administer the fund. Jamieson Decl. ¶ 18. The Rose Foundation is a 501(c)(3) located in Oakland, California. The Rose Foundation states that it believes that "[b]y redirecting money and resources to groups representing marginalized populations, we build power where meaningful change begins." *Our Mission,*

*Vision, and Roots*, Rose Found., https://rosefdn.org/about/. The Rose Foundation "advocate[s] for environmental justice (and in turn also social justice) and aim[s] to address and rectify injustices within our organization and the broader society. We commit to being a voice for equity and fairness in all our actions and policies." *Diversity, Equity, Inclusion & Justice Statement*, Rose Found. https://rosefdn.org/about/deij-statement/. Under the DTSC's regulations, in addition to overseeing the payments of the spray foam companies, the Rose Foundation is required to "recruit and convene a proposal review panel" that will determine the selection criteria to evaluate grant proposals and then will direct the Rose Foundation to disburse funds from the Green Research Fund to the selected grantees. Jamieson Decl. ¶ 10, Notice of Final Determination at 20–22.

The potential grantees of this fund money include a "wide range of entities . . . including but not limited to businesses, academic institutions, and non-profit organizations." Dkt. 1-1 at 22. These entities are incentivized to find a replacement to MDI, not just by the money from the fund, but also because any grant recipient that develops any innovation to spray foam owns the lucrative intellectual property. *Id*. at 22. And the grantees are not required to make available the innovation available to any of the spray foam companies. All DTSC requires of the grantees is that "to the extent a grantee elects to license its intellectual property, the GCEIF grant agreements shall require a grantee to offer licensing options to all [spray foam manufacturers] selling into California who are compliant with DTSC regulations, along with any other entities specifically selected by the grantee." *Id*. at 23. The grantee is free to set the price and terms for the use of their innovation that was funded by the spray foam manufacturers. Grantees must file interim progress reports and a final technical report, and those reports "shall be public and posted on CalSAFER," DTSC's online system. *Id.* at 22.

However, not included among those "wide range of entities" are the spray foam companies themselves. DTSC does not allow Quadrant to conduct its own

research with the allocated grant money. *Id*. at 18. All money must be funneled through a grant fund Quadrant did not choose, to a grantee that Quadrant has no control over selecting, to do research that Quadrant has no ability to control or direct, to discover an innovation that Quadrant would then have to license from that grantee. *Id*. at 22–23. Quadrant's first payment under the Final Determination—covering spray foam sold in California from July 1 through September 30, 2026—is due January 1, 2027. *Id*. at 27. Based on previous quarters' sales, Quadrant expects to be required to pay at least $10,000 into the Green Research Fund every quarter; a number which is expected to grow as Quadrant seeks to increase its sales within the California market. Jamieson Decl. ¶ 13.

## STANDARD OF REVIEW

Plaintiffs seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

The Ninth Circuit applies these factors under a "sliding scale" approach. Under that approach, "serious questions going to the merits" and a balance of hardships that tips sharply in the plaintiff's favor supports issuance of a preliminary injunction, so long as the plaintiff also demonstrates a likelihood of irreparable harm and that the injunction is in the public interest. *All. for the Wild Rockies*, 632 F.3d at 1134–35 (holding that the sliding scale approach remains viable after *Winter*); *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (same).

## ARGUMENT

### I. Quadrant is Likely to Prevail on the Merits of its First Amendment Claim

Quadrant is likely to succeed on its claim that the DTSC's Green Research Fund mandatory assessment violates the First Amendment. Indeed, DTSC's regulation runs directly into First Amendment precedent which holds that the government may not require private parties to subsidize other private parties' speech with which the private party disagrees. *Knox v. SEIU, Local 1000*, 567 U.S. 298, 309 (2012). As the Supreme Court has repeatedly stated, "compulsory subsidies for private speech are subject to exacting First Amendment scrutiny" *Id*. at 310; *see also*, *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018). Unless the speech is the government's own, a compelled subsidy can be sustained only if it is part of a comprehensive regulatory scheme and is a "necessary incident" of the "larger regulatory purpose which justified the required association." *United States v. United Foods, Inc.*, 533 U.S. 405, 414 (2001). Under that exacting scrutiny, a compelled subsidy must also "serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Janus*, 585 U.S. at 894 (*quoting Knox*, 567 U.S. at 310).

#### A. The Payment Requirement Compels Quadrant to Subsidize Private Speech

In *United Foods*, the Supreme Court struck down a Mushroom Checkoff Program which required producers and importers of mushrooms to pay assessments that were primarily used to fund generic advertising that promoted the sale of mushrooms. 533 U.S. at 409. The Supreme Court struck down the assessment as violating the First Amendment rights of the mushroom producers and importers because it required them to fund speech that the producers disagreed with—that there was no difference between the different brands of mushrooms. *Id*. at 411, 416. As

the Supreme Court said, "We have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself." *Id.* at 415.

Here, DTSC's requirement that Quadrant pay two cents per pound of spray polyurethane foam sold in the State, up to four million dollars, to a third party in order to fund research is exactly the sort of "compulsory subsid[y] for private speech" which the Supreme Court has struck down as unconstitutional. *Knox*, 567 U.S. at 309. Just like in *United Foods*, Quadrant is required to fund the Green Research Fund and the "principal object" of that Fund is to produce speech with which Quadrant does not agree. Dkt. 1-1 at 20 (Quadrant is "required to fund green chemistry or green engineering research."). Quadrant believes that its product is safe and is designed with the best chemicals to achieve the results its customers desire. Jamieson Decl. ¶ 6. Quadrant's own research in the Abridged AA Report supports its product safety claims. *Id.* at Ex. A. Indeed, DTSC has made Quadrant ineligible to receive any of the Fund's money precisely because of Quadrant's own research. Dkt. 1-1 at 22. Nevertheless, the Green Research Fund that Quadrant must pay into is designed to produce research to find safer alternatives to Quadrant's product, using green chemistry or engineering principles. This is precisely the sort of "compelled subsidies for speech" that the First Amendment does not permit. *United Foods*, 533 U.S. at 415.

As mentioned above, the Supreme Court has only recognized two narrow exceptions to the general rule that compelled subsidization of speech violates the First Amendment. First, if the speech is not from a private party but is from the government itself, the First Amendment does not apply. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 559–62 (2005) (government-speech exception). Second, if the money contributes to a broader regulatory scheme, then it must be a "necessary incident" of the "larger regulatory purpose which justified the required association." *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469–70 (1997) (comprehensive-regulatory-scheme exception).

### B. The Funded Speech Is Not Government Speech

First, this speech is not the government's speech. To begin with, neither the DTSC nor any other part of California government will be speaking with the money from Quadrant which goes into the Green Research Fund. Instead, the potential grantees of this fund money includes a "wide range of entities . . . including but not limited to businesses, academic institutions, and non-profit organizations." Dkt. 1-1 at 22. In fact, the fund will itself be distributed by a private third-party administrator, not DTSC. *Id.* at 17–18.

But that is not the end of the analysis, as the Ninth Circuit has held "The critical question in determining whether speech is public or private is whether the speech is 'effectively controlled' by the government." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. Vilsack*, 6 F.4th 983, 989 (9th Cir. 2021) (hereinafter, *R-CALF*) (*quoting Johanns*, 544 U.S. at 560). Relying on the Supreme Court's decision in *Johanns v. Livestock Mktg. Ass'n*, the Ninth Circuit considers three factors to determine whether the speech in question constitutes government speech. *Id*. First, whether the government has "directed the establishment of the program itself." *Id*. Second, whether the government "specifies the general content" of the speech." *Id*. Third, whether a government actor "exercises final approval authority over every word used." *Id.*

Using the *Johanns* factors, the Ninth Circuit upheld government programs in *Paramount Land Co. LP v. Cal. Pistachio Comm'n*, 491 F.3d 1003, 1009–10 (9th Cir. 2007) and *R-CALF*, 6 F.4th at 989–90. In *Paramount Land* the Ninth Circuit upheld a California statute providing subsidies from assessments on pistachio sales to the California Pistachio Commission because the State had specified the overall goal of the program—to promote pistachio sales—and exercised control over messaging. In *R-CALF*, the Ninth Circuit upheld a federal law which imposed mandatory assessments on beef products for the Montana Beef Council and other qualified state beef councils to fund promotional activities. 6 F.4th at 990. There, the

councils were required to submit all speech to the Secretary of Agriculture for approval. *Id*. at 989. The councils were also required to submit an annual budget outlining and explaining anticipated expenses and disbursements and a general description of the proposed promotion, research, consumer information, and industry information programs contemplated. *Id*.

None of those factors apply here. First, while DTSC has established the creation of a Green Research Fund, it has not established the entities that will actually be receiving the funds and will be conducting the speech that Quadrant objects to. The DTSC has not created any of the "businesses, academic institutions, and non-profit organizations" which are eligible to receive the funds. Nor did DTSC create the third-party administrator charged with collecting the money and running the Green Research Fund.

Second, the government does not specify the general content of the speech. While DTSC does outline some of the research principles that must be used to find a replacement for MDI—with which Quadrant also disagrees—it does not outline the content that must be produced by the grantees of the Green Research Fund. Dkt. 1-1 at 21. Grantees may publish research that finds there are no alternatives. Grantees may also develop new alternatives and decline to license them to anyone. *Id*. at 27. This is a far cry from the advertising cases discussed above where the government outlined that the program's speech must promote the product—whether that product is pistachios or beef. DTSC chose the subject of the research (alternatives to MDI), but choosing a subject is not controlling a message. Quadrant's objection is to being compelled to fund a private research enterprise whose object is to replace its product, whatever any particular grantee ultimately concludes.

Finally, and most obviously, no DTSC official "exercises final approval authority over every word used." *R-CALF*, 6 F.4th at 990. There is no approval process for the research that is produced using the Green Research Funds. All that is required from grantees is that they "provide interim progress reports" to the DTSC

and the third-party administrator and they "provide a final technical report." Dkt. 1-1 at 26. Nothing in the Final Determination gives DTSC authority to review, edit, or approve that content before it is published. *See id.* at 22. Therefore, the speech which Quadrant is forced to pay for is not government speech.

The Supreme Court's most recent government-speech decision confirms the point. In *Shurtleff v. City of Boston*, the Court described a "holistic inquiry" that considers "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." 596 U.S. 243, 252 (2022). Each consideration cuts against DTSC. DTSC can point to no tradition of governments speaking through privately administered research grants funded by compelled payments from a regulated industry. Research produced by a university laboratory or private business and reported under its own name will be attributed to that grantee, not to DTSC. And although DTSC collaborates with the review panel on requests for proposals and seats one non-voting staff member on the panel, the panel scores the proposals and decides which to fund, Dkt. 1-1 at 25–26, and DTSC disclaims any involvement in the Fund's "daily operations," *id.* at 26. DTSC does not write, review, or approve the research or its conclusions. The Supreme Court has also cautioned that the government-speech doctrine "is susceptible to dangerous misuse" and must be applied with "great caution." *Matal v. Tam*, 582 U.S. 218, 235 (2017).

### C. The Payment Requirement Is Not a Necessary Incident of a Comprehensive Regulatory Scheme

This speech is not part of a broader regulatory scheme, and it is certainly not a "necessary incident" of the "larger regulatory purpose which justified the required association." *Glickman*, 521 U.S. at 469–70 (establishing the comprehensive-regulatory-scheme test). Typically, courts have found that a broader regulatory scheme exists when businesses are forced together to form "a broader collective

enterprise." *R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 916 (9th Cir. 2005) (*quoting Delano Farms v. California Table Grape Comm'n.*, 318 F.3d 895, 898–99 (9th Cir. 2003). In *Glickman*, the Court rejected a First Amendment challenge to a regulatory program that required tree fruit growers to fund marketing campaigns as part of a broader regulation of the industry. 521 U.S. at 469–70. As the Ninth Circuit has explained: "If the generic advertising assessment is part of a comprehensive program that displaces many aspects of independent business activity, exempts the firms within its scope from the antitrust laws, and makes them part of a broader collective enterprise, the assessment does not violate the First Amendment." *Delano Farms*, 318 F.3d at 898–99 (internal citations omitted).

None of those factors exist here. Outside of the Green Research Fund, spray foam companies are independently required to follow the regulations set out by DTSC. Dkt. 1-1 at 7–8. DTSC does not collect any funds from the spray foam companies—instead directing a private third party to collect funds for the propagation of speech. Dkt. 1-1 at 21. Spray foam companies are not exempt from antitrust laws, nor is their business activity in any way linked to each other except for the requirements that they pay into the Green Research Fund.

Even if this regulation were interpreted as being part of a broader regulatory scheme, it is in no way necessary to that regulatory scheme. *Glickman*, 521 U.S. at 469–70. Quadrant is independently subject to DTSC's other safety requirements in order to satisfy DTSC's perceived safety concerns over Quadrant's product. None of the money that Quadrant is required to put into the Green Research Fund furthers or facilitates the safety requirements outlined by DTSC.

### D. The Payment Requirement Fails Exacting Scrutiny

Because the payment requirement compels Quadrant to subsidize private speech and no exception applies, DTSC must show that it "serve[s] a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Janus*, 585 U.S. at 894 (*quoting Knox*, 567 U.S. at 310).

Exacting scrutiny also requires that the means chosen be narrowly tailored to the interest asserted. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608–09 (2021). DTSC cannot make that showing.

Quadrant does not dispute that California has a legitimate interest in workplace safety. DTSC has addressed that interest directly through the labeling and training requirements, which Quadrant does not challenge and which DTSC itself describes as the measures that "will improve protection of applicators in the near-term." Dkt. 1-1 at 27. The Fund does nothing to reduce anyone's present exposure to MDI. Instead, its object is to underwrite early-stage research that, DTSC acknowledges, "do[es] not always result in successful advancements." *Id.* at 16.

Even assuming DTSC has a compelling interest in promoting research into MDI alternatives, the payment requirement is not tailored to it. California could fund that research directly, as it funds other research, without compelling any private party to subsidize another's speech. *Cf. Janus*, 585 U.S. at 896 (holding that the State's asserted interest could be achieved through means significantly less restrictive than compelled fees). In fact, DTSC admits it did not even consider other options. *Id.* at 25. But DTSC's own regulation offers another obvious alternative: DTSC may "require the manufacturer to initiate a research and development project," rather than "fund a challenge grant." Cal. Code Regs. tit. 22, § 69506.8. DTSC chose the pooled fund instead, and it bars Quadrant from receiving any of the money. Dkt. 1-1 at 22. DTSC's stated reason for pooling is that it "may allow faster progress" and help "smaller [spray foam] manufacturers that may not otherwise have R&D capacity." *Id.* at 30. That reasoning does not explain why a manufacturer that can do its own research must instead fund others' research. Jamieson Decl. ¶ 8. And the obligation is untethered to Quadrant's share of the market: payments continue until the Fund reaches $4 million, regardless of how many other manufacturers contribute. *Id.* at 21, 31.

DTSC may argue that Quadrant can avoid the payment requirement by ceasing to sell spray foam in California. But the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (*quoting Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006)). The ability to sell a lawful product in interstate commerce is not a government gratuity, and the payment requirement is not a condition on government funding that Quadrant chose to accept. It is a demand that Quadrant fund third-party speech as the price of continuing to sell in California, *see* Dkt. 1-1 at 5, and the First Amendment forbids it. *Cf. Janus*, 585 U.S. at 930.

**II. Independently, Quadrant is Likely to Prevail on the Merits of its Dormant Commerce Clause Claim**

The payment requirement independently violates the Dormant Commerce Clause. Even a nondiscriminatory state law is invalid where "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see also*, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023). Under this framework, "the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142.

The burden here falls almost entirely on interstate commerce. DTSC acknowledged that spray foam manufacturers are "mostly out of state." *Am. Chemistry Council*, No. F082604, 2022 Cal. App. Unpub. LEXIS at *31. Only one spray foam manufacturer remains in California, and even it manufactures outside the State. Jamieson Decl. ¶ 4. The payment requirement is a per-pound charge on goods shipped into California, owed for at least five years and until the Fund reaches $4 million, with no fixed end date. Dkt. 1-1 at 21, 31. It is imposed in a price-sensitive

market in which distributors and contractors refuse to absorb the cost, so the charge either raises the price of out-of-state spray foam or comes out of the manufacturer's margin. Jamieson Decl. ¶¶ 14–17.

The putative local benefits, by contrast, are speculative by DTSC's own account. The Fund does not reduce anyone's exposure to MDI. For that, DTSC relies on labeling and training, which Quadrant does not challenge. Dkt. 1-1 at 27. The Fund instead pays for research that DTSC concedes is "early stage and foundational," in which "[p]rojects . . . do not always result in successful advancements." *Id.* at 20. DTSC expects that "some grantees will not be successful," *id.* at 23, and that progress "may be incremental and will take time," *id.* at 27, over a program DTSC estimates will run seven years, *id.* at 23. Even if some research succeeds, nothing ensures a California benefit. Grantees keep their intellectual property and need not license it to anyone, *id.* at 26–27; any MDI alternative must still be commercialized and adopted by the market; and it even then must reduce exposure beyond what the labeling and training requirements already achieve. At every step, the benefit is contingent on the one before it. The Supreme Court has made clear that "the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack," because such regulations "may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid." *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 670 (1981) (plurality opinion).

Finally, whatever benefit the research might yield "could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142. California could fund the research itself, or let manufacturers conduct their own research, as its regulations allow. *See supra* Part I.D. A present, open-ended burden on interstate commerce in exchange for a remote and uncertain benefit is "clearly excessive." *Id.*

### III. Quadrant Will Suffer Irreparable Harm Absent an Injunction

Quadrant has also established irreparable harm. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976)). This is particularly true in the First Amendment context because the Supreme Court has made clear that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. In the Ninth Circuit, even "a 'colorable First Amendment claim' is 'irreparable injury sufficient to merit the grant of relief.'" *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (*quoting Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005)). Thus, to the extent that the Court concludes that Quadrant has at least made a colorable claim that DTSC's Green Research Fund payments violate the First Amendment, irreparable harm is satisfied as a matter of law.

The Supreme Court's compelled-subsidy cases make the same point in practical terms. Even the temporary use of an objector's money for speech he has not agreed to support is a constitutional injury. That is why the Court has required disputed fees to be held in escrow while challenges are pending, rather than collected first and refunded later. *Chicago Tchrs. Union, Loc. No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292, 305, 309–10 (1986); *see also Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*, 466 U.S. 435, 444 (1984) (rejecting a rebate scheme under which the union "obtains an involuntary loan for purposes to which the employee objects")[1].

---

[1] At minimum, if the Court is not inclined to enjoin the payment requirement outright, it should allow Quadrant to deposit its payments into the Court's registry, *see* Fed. R. Civ. P. 67(a), or into an interest-bearing escrow account, and order that none of those funds be disbursed to the Fund until final judgment. The Supreme Court has required exactly this remedy in the compelled-subsidy context, to prevent objectors' money from being spent on contested speech while their challenge is pending. *Hudson*, 475 U.S. at 309–10. An escrow fully protects DTSC's interests: if

But even if this were not the case, these mandatory payments are unrecoverable and therefore should be paused during the pendency of the litigation. *See, e.g.*, *Demers v. Austin*, 746 F.3d 402, 417 (9th Cir. 2014) (allowing injunctive relief for First Amendment violations but barring damages due to qualified immunity). Once Quadrant pays, the money goes to the third-party administrator and then to grantees, none of whom is a party to this case. Nothing in the Final Determination requires a refund if Quadrant prevails. *See* Dkt. 1-1 at 21–22. And the Eleventh Amendment bars Quadrant from recovering damages from the State. Economic loss that cannot be recovered because of sovereign immunity is irreparable. *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated on other grounds. Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606 (2012). Quadrant does not seek damages. Dkt. No. 1 at 16–17. Quadrant seeks only to halt DTSC's unconstitutional and novel Green Research Fund payment requirement. Preliminary injunction is appropriate to pause those unrecoverable payments during the pendency of the litigation.

## IV. The Balance of Equities and the Public Interest Strongly Favor Injunctive Relief

Quadrant also satisfies the two remaining equitable factors for preliminary relief. When a party is suing the government, the remaining equitable factors "merge" and largely collapse with the likelihood of success on the merits. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). This makes sense. The government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (*quoting Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983)). And "it is always in the

---

DTSC prevails, the Fund receives every dollar, with interest. If Quadrant prevails, its money will not have funded speech it was unconstitutionally compelled to support.

public interest to prevent the violation of a party's constitutional rights." *Id.* (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022)).

Even if this were not the case, the equities clearly favor preliminary relief here. If preliminary relief is granted, the only effect on DTSC will be a temporary delay in funding grants that have not yet been awarded and which the DTSC acknowledges may not be successful, while the labeling and training requirements DTSC adopted to address worker exposure remain fully in effect. By contrast, if preliminary relief is denied, Quadrant will be forced to fund speech it disagrees with using funds it cannot claw back. To afford these payments, Quadrant will likely be forced to either raise prices, which will likely result in the loss of contracts, or cut back on other aspects of its business. Jamieson Decl. ¶ 17.

Moreover, the requested injunction would preserve—not disrupt—the status quo. The Ninth Circuit has emphasized that the purpose of preliminary injunctive relief is to maintain the "status quo ante litem pending a determination of the action on the merits." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (*quoting Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009)). A prohibitory injunction that maintains existing conditions is strongly favored over one that alters them. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684–85 (9th Cir. 2023). Here, Quadrant challenges final determination wherein DTSC seeks to coerce payments from Quadrant as requirement for selling its product in the state. Quadrant does not challenge any of the actual safety measures required by DTSC regulations. Rather, it challenges a new funding requirement. Enjoining payments to the Green Research Fund preserves the status quo.

## V. The Court Should Waive the Bond Requirement or Require Only a Nominal Bond

Rule 65(c) gives the Court discretion over the amount of security, and the Court "may dispense with the filing of a bond when it concludes there is no realistic

likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). DTSC faces no realistic financial harm: the payments do not go to DTSC, and an injunction would at most delay the Fund's receipt of them.

## CONCLUSION

The Court should grant Quadrant's motion and preliminarily enjoin Defendant, and her officers, agents, employees, and all other persons in active concert or participation with them, from enforcing against Quadrant the Final Determination's requirement that Quadrant pay into the Green Chemistry and Engineering Innovation Fund.

DATED: November 9, 2026.

Respectfully submitted,

PACIFIC LEGAL FOUNDATION

*s/ Joshua Polk*
JOSHUA POLK
(Cal. Bar No.329205)
JPolk@pacificlegal.org
ANDREW R. QUINIO
(Cal. Bar No. 288101)
AQuinio@pacificlegal.org
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111

CHRISTIAN TOWNSEND
(TX Bar No. 24127538) *
CTownsend@pacificlegal.org
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
* *Pro Hac Vice*
*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Quadrant Performance Materials LLC, certifies that this brief contains 6,722 words, which complies with the word limit of L.R. 11-6.1.

*s/ Joshua Polk*
JOSHUA POLK